UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
:
TIMMY WILLIAMS,                                              :
:
                       Plaintiff,                  :
:
        - against -                                  :
:
THE CITY OF NEW YORK, DETECTIVE                              :
SNEIDER, OFFICER SCANDOLE,                                   :
LIEUTENANT ANTHONY CAROSELLI,                                :
DETECTIVE MICHAEL EGAN, DETECTIVE                            :
ANTHONY VIGGIANI, and DETECTIVE                              :
MATTHEW COLLINS,                                             :
:
                       Defendants.                 :
-------------------------------------------------------------x

FOR ONLINE PUBLICATION ONLY

MEMORANDUM AND ORDER

10-CV-2676 (JG) (LB)

A P P E A R A N C E S :

    GARY S. FISH
        15 Maiden Lane
        Suite 2000
        New York, New York 10038

        *Attorney for Plaintiff*

    MICHAEL A. CARDOZO
        Corporation Counsel of the City of New York
        100 Church Street
        New York, New York 10007
    By:   Morgan D. Kunz
        Boris Zeldin

        *Attorney for Defendants*

JOHN GLEESON, United States District Judge:

        In this action, Plaintiff Timmy Williams asserts claims pursuant to 42 U.S.C.

§ 1983 and New York state law for false arrest, false imprisonment, unreasonable seizure,

malicious prosecution and battery against the City of New York and several officers of the New

York City Police Department. The Defendants have moved for summary judgment. For the reasons set forth below, the motion is granted in part and denied in part.

BACKGROUND

A.  *Factual Background*

In the early morning hours of August 16, 2008, Bernabe Rivera was shot and killed outside of Club Sputnik, a nightclub in Brooklyn. Defs. Rule 56.1 Stmt. ¶ 3, ECF No. 25. Williams had been present at Club Sputnik and had socialized with Rivera shortly before his death. Williams Aff. ¶ 5, ECF No. 29. However, Williams has consistently denied having anything to do with Rivera's murder.

An eyewitness, referred to by the Defendants as "R.S.," told Detective Steven Sneider that he had seen a tall, stocky, black male wearing a baseball cap and a white t-shirt approach Rivera. Defs. Rule 56.1 Stmt. ¶¶ 7–8; Zeldin Decl., Ex. Q, ECF No. 24. According to R.S., there was then a muzzle flash and a gunshot, and the person in the cap and t-shirt fled the scene. Defs. Rule 56.1 Stmt. ¶ 8.

Sneider prepared a photo array consisting of separate photos of Williams and seven other men wearing white t-shirts and "posing for photos in a party like atmosphere." *Id.* ¶ 9. R.S. viewed the photo array on September 2, 2008. *Id.* ¶ 10. R.S. said either that the photo of Williams "looks like the guy he saw the night of the shooting" Zeldin Decl., Ex. J, or that he "looks the most like" the shooter, Kunz Decl., Ex. U at 217, ECF No. 28. He also told Sneider that "he remember[ed] the face and the guy had a long face." Zeldin Decl., Ex. J. He added that "[h]e would need to see the guy in person to be to tally [*sic*] sure." *Id.*

Approximately six months later, on March 6, 2009, Sneider arrested Williams at his home. Defs. Rule 56.1 Stmt. ¶ 12. Later that day, a second eyewitness, referred to as

2

"E.M.," viewed a lineup and identified Williams as the shooter.  *See* Zeldin Decl., Ex. O; *see also* Kunz Decl., Ex. R at 23.  On the following day, March 7, 2009, R.S. also viewed a lineup and identified Williams as the shooter.  *See* Zeldin Decl., Ex. P; *see also* Kunz Decl., Ex. R at 26.  That same day, Sneider signed a criminal court complaint charging Williams with Rivera's murder.  Zeldin Decl., Ex. M.

On March 27, 2009, Williams was indicted by a grand jury for murder in the second degree and criminal possession of a weapon in the second degree.  *See* Zeldin Decl., Ex. F.  On April 28, 2010, after a trial by jury, he was acquitted of all charges.  *See* Zeldin Decl., Ex. G; Defs. Rule 56.1 Stmt. ¶ 19.

B.     *Procedural Background*

Williams commenced this action on June 11, 2010.  He asserts claims pursuant to 42 U.S.C. § 1983 and state law for false arrest, false imprisonment, unreasonable seizure and malicious prosecution.  He also asserts a state law claim for battery, arising from an injury to his forehead that he suffered during his arrest.  After discovery concluded, the Defendants moved for summary judgment on December 2, 2011.  The Court heard oral argument on February 10, 2012.

DISCUSSION

A.     *Standard of Review*

Summary judgment is appropriate only when it is clear that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Novella v. Westchester Cnty.*, 661 F.3d 128, 139–40 (2d Cir. 2011); *Wilson v. Nw. Mut. Ins. Co.*, 625 F.3d 54, 60 (2d Cir. 2010); *Padilla v. Manlapaz*, 643 F. Supp. 2d 302, 306 (E.D.N.Y. 2009).  In determining whether summary judgment is appropriate, a court must construe the evidence in the light most favorable to the non-moving

3

party and draw all reasonable inferences in its favor. *Serricchio v. Wachovia Secs. LLC*, 658 F.3d 169, 179 (2d Cir. 2011).

B.      *Analysis*

Although Williams's claims for false arrest[1] and malicious prosecution have different elements, probable cause is central to both. If there was probable cause to believe that Williams had shot Rivera, then these claims cannot proceed. *See, e.g.*, *Savino v. City of New York*, 331 F.3d 63, 72, 75 (2d Cir. 2003) (probable cause is a complete defense to a malicious prosecution claim under New York law or under § 1983); *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996) ("The existence of probable cause to arrest . . . is a complete defense to an action for false arrest, whether that action is brought under state law or under § 1983." (internal quotation marks and citation omitted)).

Probable cause for an arrest exists when an officer has "knowledge of, or reasonably trustworthy information as to, facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that an offense has been or is being committed by the person to be arrested." *Manganiello v. City of New York*, 612 F.3d 149, 161 (2d Cir. 2010) (internal quotation marks and citations omitted); *see also Savino*, 331 F.3d at 76. Although "probable cause does not demand the certainty we associate with formal trials," *Massachusetts v. Upton*, 466 U.S. 727, 734 (1984) (internal quotation marks and citation omitted); *see also Krause v. Bennett*, 887 F.2d 362, 370–71 (2d Cir. 1989), it must rest on "more than rumor, suspicion, or

---

[1] For purposes of this case, there is no meaningful distinction between a claim for false arrest and false imprisonment. *See Jenkins v. City of New York*, 478 F.3d 76, 88 n.10 (2d Cir. 2007); *Bowman v. City of Middletown*, 91 F. Supp. 2d 644, 660 (S.D.N.Y. 2000). "False arrest is simply an unlawful detention or confinement brought about by means of an arrest rather than in some other way and is in all other respects synonymous with false imprisonment." *Covington v. City of New York*, 171 F.3d 117, 125 (2d Cir. 1999) (Glasser, J., dissenting). *But cf. Druschke v. Banana Republic, Inc.*, 359 F. Supp. 2d 308, 312 (S.D.N.Y. 2005) (explaining that false arrest and false imprisonment claims against private entity had distinct factual bases and were not duplicative). Thus, although Williams has pleaded both false arrest and false imprisonment claims, I will treat them as a single claim for false arrest.

4

even a 'strong reason to suspect.'" *United States v. Fisher*, 702 F.2d 372, 375 (2d Cir. 1983) (quoting *Henry v. United States*, 361 U.S. 98, 101 (1959)) (other internal quotation marks and citation omitted). The inquiry is an objective one, and "an arresting officer's state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause." *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004).

Even if probable cause were lacking, summary judgment might still be appropriate if the Defendants are entitled to qualified immunity. "Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2080 (2011).

"The right not to be arrested or prosecuted without probable cause has, of course, long been a clearly established constitutional right." *Golino v. City of New Haven*, 950 F.2d 864, 870 (2d Cir. 1991). Defining the right at this "high level of generality," however, "is of little help in determining whether the violative nature of particular conduct is clearly established." *Al-Kidd*, 131 S. Ct. at 2084. The appropriate inquiry is whether there was "arguable probable cause" under the particular facts and circumstances, *i.e.*, whether "(a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." *Amore v. Novarro*, 624 F.3d 522, 536 (2d Cir. 2010) (internal quotation marks and citations omitted); *see also Caceres v. Port Auth. of N.Y. & N.J.*, 631 F.3d 620, 622 (2d Cir. 2011); *Golino*, 950 F.2d at 870.

1.  *The Malicious Prosecution Claim*

In New York, "'indictment by a grand jury creates a presumption of probable cause'" in a malicious prosecution claim under § 1983 or state law, which "may be rebutted only 'by evidence that the indictment was procured by fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith.'" *Manganiello*, 612 F.3d at 162 (quoting *Savino*, 331 F.3d at 72) (other internal quotation marks and citation omitted). There is nothing in the record indicating what evidence was presented to the grand jury, let alone that any of it was fraudulent, fabricated or otherwise the product of bad-faith conduct. Accordingly, Williams has not rebutted the presumption of probable cause.

In addition, before any criminal proceedings were commenced against Williams, at least one of the eyewitnesses had identified him as the shooter. As explained below, this identification established probable cause. Therefore, the Defendants' motion for summary judgment is granted with respect to the malicious prosecution claim.

2.  *The False Arrest Claim*

The presumption of probable cause triggered by an indictment does not apply to a false arrest claim. *See McClellan v. Smith*, 439 F.3d 137, 145 (2d Cir. 2006); *Savino*, 331 F.3d at 75. Nevertheless, the Defendants argue that probable cause existed when R.S. identified Williams from a photo array and, if not then, certainly when both R.S. and E.M. identified Williams in separate lineups.[2]

---

[2] Williams challenges the Defendants' reliance on statements by R.S. and E.M. that are contained in police reports. While summary judgment may only be granted on the basis of admissible evidence, *see Estate of Hamilton v. City of New York*, 627 F.3d 50, 53 (2d Cir. 2010), the witness statements recorded in the police reports are not inadmissible hearsay because they are not offered for the truth of the matter asserted, *i.e.*, that Williams was the shooter, but for purposes of establishing whether the police had information establishing probable cause. *See, e.g.*, *Batson-Kirk v. City of New York*, No. 07-CV-1950 (KAM) (JMA), 2009 WL 1505707, at *5 (E.D.N.Y. May 28, 2009). The police reports themselves are admissible as public records. *See* Fed. R. Evid. 803(8); *Parsons v. Honeywell, Inc.*, 929 F.2d 901, 907 (2d Cir. 1991).

As explained below, I conclude that while the identification from the photo array did not establish probable cause, the subsequent lineups did or, at the very least, they established arguable probable cause. Accordingly, the Defendants' motion for summary judgment is granted with respect to Williams's false arrest claim for the period after the first lineup, but is denied with respect to the pre-lineup period.

      a.    *The Photo Array*

The sole asserted basis for probable cause at the time of Williams's arrest was a purported identification of Williams as the shooter made by R.S. after viewing a photo array.[3] Williams argues that the photo array was unduly suggestive and that R.S.'s identification was too tentative to establish probable cause.

While an unequivocal identification is generally sufficient to establish probable cause, an identification that is tentative or uncertain may, on its own, be insufficient. *See, e.g.*, *Ewing v. City of Stockton*, No. 2:05-2270 WBS GGH, 2010 WL 3516351, at*9 (E.D. Cal. Sept. 2, 2010) ("It is clearly established that the tentative identification of [the plaintiff] estimated at only a fifty to sixty percent accuracy was insufficient to give rise to probable cause that [he] committed the murder."); *Mayes v. City of Hammond, Ind.*, 442 F. Supp. 2d 587, 648 (N.D. Ind. 2006) ("the suggestive and tentative nature of [the victim's] identification" precluded a holding that probable cause existed as a matter of law); *Smith v. Gildea*, No. 97 C 1581, 1998 WL

---

[3] There is evidence in the record that a second witness viewed a photo of Williams and was able to identify him as the shooter on December 23, 2008. *See* Kunz Decl., Ex. R at 10–12. And, at oral argument, counsel for the Defendants referred to the fact that another witness had independently identified Williams as having been present at Club Sputnik and wearing a white t-shirt on the night of the shooting. Sneider himself did not refer to any of this as a basis for probable cause in his affidavit, *see* Kunz Decl., Ex. T, nor is it referred to in the Defendants' brief or statement pursuant to Local Civil Rule 56.1. Accordingly, I may disregard this evidence for purposes of this motion. *See* Fed. R. Civ. P. 56(c)(3) (court considering summary judgment motion need consider only portions of the record cited by the parties). In any event, the mere fact that Williams was present at Club Sputnik on the night of the shooting would not tip the scales in favor of probable cause; nor would evidence that Williams was wearing a white t-shirt, at least absent additional information such as how many other Club Sputnik patrons had been wearing white t-shirts that night and whether the photo array included their photos. *See Jenkins*, 478 F.3d at 90–91 (fact that suspect was wearing t-shirt similar to that worn by perpetrator did not establish probable cause).

7

703677, at *8 (N.D. Ill. Sept. 30, 1998) (witness's statement, after viewing photo array, that suspect "'strongly resembled' one of the perpetrators" was "insufficient, on its own, to establish the requisite probable cause"); *Nelson v. Mattern*, 844 F. Supp. 216, 221 (E.D. Pa. 1994). Of particular concern are what may be called "comparative identifications" – those in which a witness states only that a suspect appears more like the perpetrator than the other individuals included in a photo array. *See Torres v. City of Los Angeles*, 548 F.3d 1197, 1209 (9th Cir. 2008) (witness's statement that plaintiff looked more like perpetrator than others in photo array did not establish probable cause as a matter of law); *Hightower v. Schaubhut*, No. Civ. A. 89-3243, 1990 WL 58129, at *1, *4 (E.D. La. Apr. 26, 1990) (same). Indeed, a witness's statement that a suspect more closely resembles the perpetrator than other individuals is not really an identification at all.

   Here, there is evidence that R.S. made only a comparative identification of Williams after viewing the photo array. According to police records, R.S. said Williams "*looks like* the guy he saw the night of the shooting." Zeldin Decl., Ex. J (emphasis added). R.S. added that "[h]e would need to see the guy in person" to be sure. *Id.* When R.S. later testified at Williams's criminal trial, he explained that when shown the photo array, he said that Williams "looks the *most* like" the shooter. Kunz Decl., Ex. U at 217 (emphasis added); *see also id.* at 218.

   Viewing the evidence in the light most favorable to Williams, R.S.'s statements in response to the photo array, on their own, were insufficient to establish probable cause. R.S. did not positively identify Williams as the shooter at all. He could only say that Williams looked more like the shooter than the other individuals the police had selected for the photo array.

8

Moreover, R.S. even told the police that he could not positively identify Williams as the shooter unless he saw him in person.

This information certainly warranted further investigation of Williams and, coupled with other evidence, might have supported a finding of probable cause. *Cf. United States v. Briley*, 726 F.2d 1301, 1306 (8th Cir. 1984) (two tentative photo identifications might not have established probable cause on their own, but probable cause existed when these identifications were coupled with other evidence); *United States v. Titus*, 445 F.2d 577, 578 (2d Cir. 1971) ("Whether or not the combination of the informant's report and the [eyewitness's] 'tentative' identification of [the defendant's] photograph would have sufficed [to establish probable cause], [a co-defendant's] positive statement was more than enough to tip the scales."). But the fact that one person more closely resembles a perpetrator than seven other individuals may simply be the result of chance or, worse, poor comparative selections by the police.[4] Probable cause must be based on more than this. *See Jenkins*, 478 F.3d at 90.

Moreover, there was not even arguable probable cause. Any reasonable officer would conclude that the mere fact that a suspect bears a relative resemblance to the perpetrator does not justify arresting that person absent additional evidence. Accordingly, qualified immunity on this portion of Williams's false arrest claim is unwarranted.

    b. *The Lineups*

Unlike a comparative or tentative identification, an eyewitness's unequivocal identification of an individual as the perpetrator of the crime generally establishes probable cause, as long as it is reasonable to believe the eyewitness under the circumstances. *See, e.g.*, *Abreu v. City of New York*, No. 04-CV-1721 (JBW), 2006 WL 401651, at *5 (E.D.N.Y. Feb. 22,

---

[4] When Sneider was asked why had had chosen certain photos to include in the array, he said that he was looking for pictures of men wearing white t-shirts and in a "party environment," but he did not say that he tried to identify men who had physical characteristics similar to Williams's. Kunz Decl., Ex. S at 258.

9

2006); *Breitbard v. Mitchell*, 390 F. Supp. 2d 237, 245 (E.D.N.Y. 2005); *Richards v. City of New York*, No. 97 Civ. 7990 (MBM), 2003 WL 21036365, at *17 (S.D.N.Y. May 7, 2003). Here, both R.S. and E.M. identified Williams as the shooter after viewing lineups, and the Defendants argue these identifications established probable cause.[5]

Williams disputes the existence of probable cause after the lineups, however, and argues that they were conducted in an unduly suggestive manner. He claims that he differed from the other lineup participants, known as "fillers," in his clothing, height, build and complexion. *See* Williams Aff. ¶ 3.[6]

"It is well-settled that there is no requirement that all line-up participants be identical in appearance." *Velazquez v. Poole*, 614 F. Supp. 2d 284, 324 (E.D.N.Y. 2007) (citing *Roldan v. Artuz*, 78 F. Supp. 2d 260, 271 (S.D.N.Y. 2000)); *see also Espiritu v. Haponik*, No. 05 Civ. 7057 (RJS), 2012 WL 161809, at *6 (S.D.N.Y. Jan. 19, 2012). "When the appearance of participants in a lineup varies, the Second Circuit has held that 'the principal question in determining suggestiveness is whether the appearance of the accused, matching descriptions given by the witness,' so stood out from the other participants as to suggest to the witness that the suspect was the culprit." *West v. Greiner*, No. 01-CV-1267 (JG), 2004 WL 315247, at *5 (E.D.N.Y. Feb. 12, 2004) (quoting *United States v. Wong*, 40 F.3d 1347, 1359–60 (2d Cir. 1994)) (other internal quotation marks and citation omitted). "In other words, a 'lineup is unduly suggestive as to a given defendant if he meets the description of the perpetrator previously given

---

[5] Williams argues that it is not clear whether E.M., who viewed the first lineup, identified him as the shooter or just as someone he had seen at Club Sputnik on the night of the shooting. While the police report does not expressly state that E.M. identified Williams as the shooter, Sneider testified that E.M. did so. *See* Kunz Decl., Ex. R at 23 ("[E.M.] said that [Williams] was the one that did the shooting."). Given that testimony, the omission from the police report of an express statement that E.M. identified Williams *as the shooter* is insufficient, on its own, to create a genuine factual dispute as to this point.

[6] Williams also complains that a police officer was one of the fillers, but he fails to explain how this, on its own, rendered the lineups unduly suggestive.

by the witness and the other lineup participants obviously do not.'" *Washington v. Ercole*, No. 08-CV-4835 (NGG) (SMG), 2010 WL 6538639, at *4 (E.D.N.Y. Apr. 2, 2010) (quoting *Raheem v. Kelly*, 257 F.3d 122, 134 (2d Cir. 2001)), *report and recommendation adopted by* 2011 WL 1527789 (E.D.N.Y. Apr. 20, 2011).

Impermissible variances between a suspect and fillers may include physical characteristics such as height, weight and skin tone, as well as clothing or other features. *See, e.g.*, *Raheem*, 257 F.3d at 134 ("Lineups in which suspects are the only participants wearing distinctive clothing or otherwise matching important elements of the description provided by the victim have been severely criticized as substantially increasing the dangers of misidentification." (quoting *Israel v. Odom*, 521 F.2d 1370, 1374 (7th Cir. 1975)) (internal quotation marks omitted)); *see also Frazier v. New York*, 156 F. App'x 423, 425 (2d Cir. 2005) (lineup was unduly suggestive where suspect "was the only person in the lineup with dreadlocks of any significant length, and dreadlocks of alternating length were the most distinctive feature of the description given by the victim who identified him from the lineup"). The Second Circuit has cited, as an example of an unduly suggestive lineup, a case in which eyeglasses were a salient feature of the perpetrator's description and the suspect was the only person in the lineup wearing eyeglasses. *See Raheem*, 257 F.3d at 134.

Viewed in the light most favorable to Williams, the evidence shows that he more closely matched the perpetrator's description than the fillers. The description of the shooter that R.S. gave to the police on the day of the shooting was "a tall, stocky, male black, wearing a black [baseball] cap, white T-shirt and dark jeans." Zeldin Decl., Ex. Q. Williams describes himself as "a healthy and muscular African-American male." Williams Aff. ¶ 3. The fillers "included African-American homeless people from [a] nearby . . . shelter," who he describes as "gaunt,

11

sickly in appearance, and . . . unhealthy." *Id.* And he claims each of the fillers differed from him in height by at least four inches. *Id.*[7] The fact that other fillers did not match Williams's height or build was problematic given that the shooter was described as being tall and stocky, characteristics arguably possessed by Williams alone. *See Wong*, 40 F.3d at 1359 ("[L]ineups that unnecessarily contrast the height of a suspect with that of the other participants have been condemned as suggestive . . . ." (citing *Foster v. California*, 394 U.S. 440, 442–43 (1969); *McFadden v. Cabana*, 851 F.2d 784, 785, 789–90 (5th Cir. 1988))); *see also West*, 2004 WL 315247, at *5.

In addition, Williams may have been the only person in both lineups that was wearing a "do-rag."[8] Williams Aff. ¶ 3. He argues that this is "a garment usually worn by an individual with a gang affiliation" and the do-rag was "an indelible Scarlet Letter" signaling to the witnesses that he was the killer. Pl. Mem. of Law 5, ECF No. 29. Since the shooter had been wearing a hat, any distinction relating to headgear among the lineup participants would have been suggestive. *See Raheem*, 257 F.3d at 134.

In combination, Williams's testimony that he was the only person with a covered head and that the other fillers did not match the description of the shooter's height and build, accepted for purposes of the Defendants' motion, establishes that the lineups were unduly suggestive. Nevertheless, even accepting Williams's version of events, the lineups were not so flawed that they could not support probable cause.

---

[7] Williams also asserts that he is "a medium complected person of color," and the fillers "were either much darker than [him], or much lighter than [him] in skin tone." Williams Aff. ¶ 3. However, there is nothing in the record to suggest that skin tone was an important feature of the perpetrator's description.

[8] According to testimony offered by the Defendants, all of the lineup participants were wearing identical do-rags. *See* Kunz Decl. Ex. S at 275–76, 283–84. For purposes of this motion, however, I must view the evidence in the light most favorable to Williams and credit his testimony.

Suggestive lineup procedures certainly increase the risk of a mistaken identification, but they do not always render the identification unreliable. Thus, evidence from a suggestive lineup may be admitted at trial if it other factors indicate that the identification was not produced by the improperly suggestive procedures. *See Manson v. Brathwaite*, 432 U.S. 98, 112–14 (1977); *Raheem*, 257 F.3d at 135. Barring identification evidence whenever improper procedures were followed would "automatically and peremptorily, and without consideration of alleviating factors, keep[] evidence from the jury that is reliable and relevant." *Brathwaite*, 432 U.S. at 112; *see also Perry v. New Hampshire*, 132 S. Ct. 716, 724 (2012). Similarly, the police may justifiably use "reliable and relevant" information to establish probable cause, even if the information was obtained from a suggestive identification.

In assessing whether identification evidence arising from a suggestive procedure should nonetheless be admitted at trial, courts look to factors identified by the Supreme Court in *Neil v. Biggers*, 409 U.S. 188 (1972):

> [1] the opportunity of the witness to view the criminal at the time of the crime, [2] the witness' degree of attention, [3] the accuracy of the witness' prior description of the criminal, [4] the level of certainty demonstrated by the witness at the confrontation, and [5] the length of time between the crime and the confrontation.

*Raheem*, 257 F.3d at 135 (quoting *Biggers*, 409 U.S. at 199–200) (internal quotation marks omitted) (alterations in original). If weighing these factors establishes independent reliability, then the identification is admissible – and therefore sufficient to support probable cause. *See Jenkins*, 478 F.3d at 93 n.18 (identification evidence that would be admissible at trial is also sufficient to establish probable cause)

But the *Biggers* factors need not be applied where the issue is probable cause rather than admissibility at trial. Probable cause requires only a probability, not certainty,

13

confidence or even a *prima facie* showing of criminal activity. *See Walczyk v. Rio*, 496 F.3d 139, 156–57 (2d Cir. 2007); *see also Illinois v. Gates*, 462 U.S. 213, 231–32, 235 (1983). Since probable cause demands much less certainty than that required for a criminal conviction, the evidence required need not be as reliable. Concerns about reliance on tainted evidence to convict a defendant at trial do not apply with nearly the same force when such evidence is used to establish probable cause. Moreover, law enforcement officers, who may be forced by necessity to employ less-than-perfect procedures, will not always have the ability to assess and weigh the *Biggers* factors during the course of an ongoing investigation. Thus, *Biggers* may be too exacting a standard in this context.

Rather than *Bigger*'s assessment of independent indicia of reliability, the relevant inquiry for purposes of probable cause is whether the flaws in the lineup procedures increased the risk of a misidentification to an extent that the resulting identification no longer supports the requisite probability that the suspect has perpetrated a crime. For example, in *Jenkins*, the Second Circuit held that a witness's identification did not establish probable cause because the witness was told he had to identify someone in the lineup as the perpetrator. *See Jenkins*, 478 F.3d at 93. This suggestiveness "did more than simply increase the odds that he would pick a person most closely resembling the perpetrator rather than pick no one at all." *Id.* Instead, the police "took the option to not pick anyone off the table."

In contrast, the defects here did not "render the lineup[s] so defective that probable cause could not reasonably be based upon [them]." *Id.* There is no evidence that the police told the witnesses they had to identify someone or that they should identify Williams. While the procedures may have increased the odds that the witnesses would identify Williams

14

rather than a filler, they did not prevent either witness from declining to identify anyone or qualifying their identifications as comparative or tentative.

The lineups here, though suggestive, were certainly no more suggestive than identifications made from the exhibition of a single photograph or during a "show-up." These procedures are "inherently suggestive" because only a single suspect is presented to the witness, *Brisco v. Ercole*, 565 F.3d 80, 88 (2d Cir. 2009); *Mysholowsky v. State of New York*, 535 F.2d 194, 197 (2d Cir. 1976), but are necessary investigatory tools in many cases, *see Brisco*, 565 F.3d at 88–89, 91, and resulting identifications may still be admitted at trial, *see, e.g.*, *Biggers*, 409 U.S. at 198 ("[T]he admission of evidence of a showup without more does not violate due process."); *Wiggins v. Greiner*, 132 F. App'x 861, 865 (2d Cir. 2005); *United States v. Mohammed*, 27 F.3d 815, 821 (2d Cir. 1994). In *Brisco*, the Second Circuit observed that a show-up procedure may appropriately be used to establish probable cause. *See Brisco*, 565 F.3d at 91; *see also Gil v. Cnty. of Suffolk*, 590 F. Supp. 2d 360, 368 (E.D.N.Y. 2008); *United States v. Camacho*, No. 04-CR-637 (ERK) (JMA), 2005 WL 1594257, at *7 (E.D.N.Y. July 5, 2005). If the police may lawfully arrest someone as the result of a show-up, then an arrest on the basis of the lineups conducted in this case was lawful as well.

Even if probable cause were lacking after the lineups, there was at least arguable probable cause. Reasonable officers could disagree as to whether these lineups were so flawed that they could not support probable cause. Accordingly, the Defendants are entitled to qualified immunity with respect to the false imprisonment claims for the period after the first lineup was completed.

      3.    *The Unreasonable Seizure Claim*

Because of "overriding respect for the sanctity of the home," *Payton v. New York*, 445 U.S. 573, 601 (1980), a warrantless seizure there is "presumptively unreasonable," *id.* at 586; *see also Kyllo v. United States*, 533 U.S. 27, 37–38 (2001). Thus, absent exigent circumstances or consent, an arrest inside the home requires not only probable cause, but also a warrant. *See Payton*, 445 U.S. at 576; *see also New York v. Harris*, 495 U.S. 14, 17 (1990); *Steagald v. United States*, 451 U.S. 204, 211 (1981). However, if a person voluntarily places himself or his home in public view, then there is no longer a reasonable expectation of privacy and the police can make a warrantless arrest. *See United States v. Santana*, 427 U.S. 38, 42 (1976) (arrest of suspect standing in the doorway of her home did not require a warrant); *United States v. Gori*, 230 F.3d 44, 52–54 (2d Cir. 2000) (arrest of suspects who opened the door to their home in response to the knock of an invitee did not require a warrant).

The circumstances of Williams's arrest are disputed. According to Sneider's testimony, he went to Williams's apartment, knocked on the door and asked Williams to speak with him. Kunz Decl., Ex. R at 14–15. Williams told Sneider he was willing to talk, but he was wearing only boxer shorts and wanted to put on some clothes. *Id.* at 15. Sneider said that would be fine. *Id.* Williams shut the door and after a few minutes, he returned fully dressed. *Id.* Williams invited Sneider into his home, but Sneider said he wanted to talk outside the apartment. *Id.* Williams then "stepped over the doorway and kind of straddled the threshold." *Id.* He "[d]idn't step completely outside the apartment, just over the doorjamb." *Id.* Sneider then grabbed Williams and began to put handcuffs on him. *Id.* Williams then tried to go back in his apartment, which led to a struggle during which Williams fell to the floor and accidentally suffered an injury to his forehead. *Id.* at 15–16.

16

Williams largely agrees with this account up until the point where he went to get dressed. Williams Aff. ¶ 7. However, he denies that he invited the police into his apartment. *Id.* He claims that when he went to put some clothes on, the police "barged into" the apartment, tackled him and kneed him in the forehead, causing an abrasion.[9] *Id.*

If Williams's version of the events is true, then the arrest was unlawful even if it had been supported by probable cause. Though Williams had initially opened the door to public view, he then reestablished a state of privacy when he closed the door and sought to get dressed. He claims it was at this point when the police entered his apartment and arrested him. There was no indication that he was attempting to flee or destroy evidence such that exigent circumstances justified the warrantless entry into his home. Indeed, he asked for permission to return inside his home to put on clothes and Sneider told him he could do so. *Cf. Santana*, 427 U.S. at 42–43 (warrantless arrest inside the home was permissible where police were in "hot pursuit" of suspect who retreated into her house after police had identified themselves and attempted to arrest her while she was standing in her doorway). Under the law of this Circuit, an arrest under these circumstances required a warrant. *See Breitbard v. Mitchell*, 390 F. Supp. 2d 237, 248 (E.D.N.Y. 2005) ("The Second Circuit has generally found *Santana*'s reasoning inapplicable when the arrestee attempts to stay within his or her home."); *see also Loria v. Gorman*, 306 F.3d 1271, 1283–84, 1286 (2d Cir. 2002) (warrant required to arrest suspect who opened the door to his home for police, but "was attempting to limit his exposure to public view" by remaining two steps past the doorway and closing the door); *United States v. Reed*, 572 F.2d 412, 422–23 (2d Cir. 1978).

---

[9] Williams has asserted a battery claim arising from this injury. *See* Am. Compl. ¶¶ 28–29, ECF No. 9. The Defendants' motion papers do not address the battery claim, perhaps because, as their counsel stated at oral argument, they do not believe a battery claim was alleged. In any event, given the factual dispute regarding the circumstances of the arrest, summary judgment on the battery claim would be improper. Accordingly, summary judgment on that claim is denied.

17

Whether the warrantless arrest of Williams was lawful under the Defendants' version of events is a more complicated question. *See generally United States v. 90-23 201st St., Hollis, N.Y.*, 775 F. Supp. 2d 545, 557–61 (E.D.N.Y. 2011) (analyzing cases involving warrantless arrests of suspects who open their doors to law enforcement agents). I need not delve into this question now, however, because for purposes of this motion, I must accept Williams's version of events as true, not the Defendants'. Under Williams's version, the warrantless arrest was unlawful.

Moreover, the warrantless arrest of a suspect in his home absent exigent circumstances or consent violates clearly established law. *Loria*, 306 F.3d at 1286. No reasonable officer could have concluded that he could enter Williams's home to arrest him merely because he had opened the door in response to the officer's knock, but then retreated into his home to get dressed. Qualified immunity is therefore unavailable.

  4. *The Appropriate Defendants*

I have concluded that a reasonable jury could find in Williams's favor on his pre-lineup false arrest claim, his unreasonable seizure claim arising from his warrantless arrest and his battery claim. However, no evidence links any of the police officers other than Sneider to the events that give rise to these claims. Accordingly, summary judgment is granted with respect to all claims against the individuals named in the amended complaint other than Sneider.

In addition, the City of New York cannot be liable under § 1983 because there is no evidence that the unlawful arrest and battery of Williams was the result of "a municipal custom or policy." *Costello v. City of Burlington*, 632 F.3d 41, 49 (2d Cir. 2011) (internal quotation marks and citation omitted). However, the City may be liable under the theory of *respondeat superior* for state law false arrest and battery claims. *See, e.g.*, *Anderson v. City of*

*New York*, --- F. Supp. 2d ----, No. 06-CV-5363 (KAM) (VVP), 2011 WL 4403622, at *16 (E.D.N.Y. Sept. 20, 2011) ("[U]nder the common law, 'unlike § 1983, a municipality may be held liable for common law false arrest and malicious prosecution on a theory of *respondeat superior*.'" (quoting *Chimurenga v. City of New York*, 45 F. Supp. 2d 337, 344 (S.D.N.Y. 1999))); *Searles v. Pompilio*, 652 F. Supp. 2d 432, 441 (S.D.N.Y. 2009); *Munoz v. City of New York*, No. 04 Civ. 1105 (JGK), 2008 WL 464236, at *7 (S.D.N.Y. Feb. 20, 2008); *see also Raysor v. Port Auth. of N.Y. & N.J.*, 768 F.2d 34, 38 (2d Cir. 1985).  Accordingly, the motion for summary judgment is denied with respect to the state law claims against the City that have survived the analysis above, and granted with respect to all other claims against the City.[10]

---

[10] At oral argument, Williams's counsel conceded that summary judgment was warranted in favor of the Defendants other than Sneider, in part because of the absence of evidence of a municipal policy or custom that could give rise to the City's liability under § 1983.  On further reflection, however, since the City may be vicariously liable under state law even absent such a policy or custom, William's counsel may have intended his concession to apply only to the § 1983 claims.

19

## CONCLUSION

For the reasons stated above, the Defendants' motion for summary judgment is denied with respect to the claims against Sneider and, to the extent they arise under state law, the City of New York for false arrest during the pre-lineup period, unreasonable seizure due to the absence of a warrant for Williams's arrest, and battery, and the motion is granted in all other respects. A final pretrial conference will be held on March 9, 2012, at 9:30 AM; jury selection and trial will commence on March 12, 2012, at 9:30 AM.

So ordered.

John Gleeson, U.S.D.J.

Dated: February 15, 2012
       Brooklyn, New York